[Civ. No. 1832.   Second Appellate District.—July 21, 1916.]

CITY OF LOS ANGELES (a Municipal Corporation), Respondent, v. LOS ANGELES PACIFIC COMPANY (a Corporation) et al., Appellants; MARTHA J. AYLESWORTH et al., Defendants.

Eminent Domain — Public Park — Power Pole Line and Proposed Subway Rights of Electric Railroad Company—Protection from Condemnation—Duty of Court.—In an action brought by a municipal corporation to condemn a large tract of land for the purposes of a public park, where there is included in such tract certain parcels belonging to an electric railway company and used by it for the purposes of a power pole line and certain other parcels which the company had acquired for the purpose of constructing and operating a subway, it is the duty of the court to determine as a matter of fact, both as to the pole line and the subway parcels, whether they had been dedicated to a public use, upon which issue the burden

of proof is on the defendant, and if either or both of them were devoted to a public use, then the court should determine as a matter of fact whether that and the proposed park use were consistent, upon which issue the burden of proof is on the plaintiff, and if the respective uses are not in fact wholly inconsistent, then it is the further duty of the court to fix the terms and conditions of condemnation by the city, and the manner and extent of use of the property "for each of such purposes."

ID.—Taking of Property Already Devoted to Public Use—Construction of Statutes.—The statutes contemplate the taking of private property for public use, and also that property already devoted to public use may be taken for a more necessary public use, but that in the latter case where the proposed new use is also consistent with the existing public use, the two rights shall be exercised in common, under the terms and conditions appropriate to the case.

ID.—Taking of Property for Park Purposes — Determination of Legislative Body of Municipality—How Far Conclusive—Construction of Park and Playground Act and Code.—The general rule which is found in section 1241 of the Code of Civil Procedure and in the Park and Playground Act (Stats. 1909, p. 1066 et seq.), and which authorizes the legislative body of a city to finally determine that the public necessity and convenience require that certain land be condemned for park purposes, is modified by subdivision 4 of section 1240 of such code, enacted to meet the specifically designated case where it is proposed to condemn land already subject to an existing public use; and under such a situation, while the court will recognize as final the determination of the legislative body that the taking of the land is necessary for public use, it is required also to recognize the existing public use, and to provide for the terms and conditions upon which the existing use may continue, if in fact the two uses are capable of coexisting on the same premises.

ID.—Los Angeles Charter — Use of Part of Park for Power Pole Line.—The provision of section 119b of the charter of the city of Los Angeles, that all property located therein which has been or may be set apart or dedicated for the use of the public as a park or parks shall forever remain inviolate to the use of the public for such purpose, means no more than that when land has been acquired by the city for park uses, such land shall not thereafter be appropriated to other uses, and does not prevent such city from acquiring land for park purposes, subject to the use thereof for another purpose to which it has been dedicated, where the two uses are consistent and capable of existing together.

ID.—Lands Occupied for Power Pole Line Purposes—Public Use.— The use of land occupied by an electric railway company for pole line purposes is a public use.

ID.—Lands Acquired for Subway — Noncompletion — Public Use.— Parcels of land purchased and held by an electric railway company

for the purpose of constructing therein a subway are devoted to a public use, notwithstanding that all parcels necessary to the construction of such subway had not been obtained, where about ninety per cent of the parcels had been acquired and it is shown to be the intention of the company to complete the enterprise.

Id.—Amount of Compensation—Accrued Taxes at Time of Award.— In awarding damages in an action in eminent domain, section 1249 of the Code of Civil Procedure excludes all consideration other than the value of the property at the date of the issuance of the summons in the action, and therefore no award is permissible for taxes and assessments not accrued at the time of the award.

Id.—Easement for Pole Line—Right to Compensation for Taking.— An easement over land for a power pole line acquired by a street railroad corporation is a substantial property right, the value of which should be accounted for by any other party seeking to enforce a superior right of eminent domain upon the same premises; and the owners of the fee are not entitled to all the compensation to be allowed for the taking of the land, if the right of way is to be included in the condemnation without any reservation of further right of use by the company.

APPEAL from a judgment of the Superior Court of Los Angeles County, and from an order denying a new trial. Lewis R. Works, Judge.

The facts are stated in the opinion of the court.

Frank Karr, R. C. Gortner, and A. W. Ashburn, Jr., for Appellants.

Albert Lee Stephens, City Attorney, and Charles S. Burnell, Assistant City Attorney, for Respondent.

CONREY, P. J.—Appeal from interlocutory judgment of condemnation and from an order denying motion for new trial.

This action was brought for the condemnation of a large tract of land within the city of Los Angeles for the purpose of a projected public park, commonly known as "Silver Lake Park." The action was brought after and pursuant to proceedings by the city council of the city of Los Angeles, which said proceedings were had in accordance with the provisions of the "Park and Playground Act of 1909" (found at page 1066 et seq., Stats. 1909). Included with the land sought to be condemned were certain parcels belonging to appellants

herein and designated as parcels 43, 46, 86, 87, 92, 93, and 94; also a certain other parcel of land claimed by the defendant railway company as belonging to it by virtue of dedication to public use and occupied by it for pole line purposes, which parcel is not separately described in the complaint, but is described in the answer and amendment to answer of appellants, and was at the trial of this action designated, for convenience, as parcel 46½. Parcels Nos. 86, 87, 92, 93, and 94 stand of record in the name of the Los Angeles Pacific Land Company, but that company holds the same as trustee for the Pacific Electric Railway Company, the land company having been formed as a matter of convenience in holding lands for the railway company, and all of the money for the purchase of said lands having been advanced by the railway company, which owns all of the stock of the land company. The Los Angeles Pacific Company is merely the predecessor of the Pacific Electric Railway Company, and has been absorbed into the latter company by a consolidation under section 473 of the Civil Code. Parcels 43, 46, and 46½ are, and at the time of the commencement of this action, on January 18, 1913, were, being used for the purposes of a high tension electric power transmission line extending from defendant's Olive substation on Sunset Boulevard, across the proposed parkway in a general southwesterly direction. This pole line carries fifteen thousand volts of electricity, which form the chief supply of energy for the operation of defendant's cars over its western division, which includes all of Hollywood, Beverly, Sawtelle, Santa Monica, and several other west coast beaches. Parcels 87, 93, and 94 were prior to the commencement of this action acquired for the purpose of constructing and operating an electric railroad subway from defendant's Hill Street station, Los Angeles, to its Vineyard station at the westerly city limits. The subway has not been actually constructed, and the court found that these parcels of land, which form but part of a long strip of land, acquired and held as a right of way for electric railroad subway purposes, had not been devoted to public use.

Parcels 86 and 92, it is admitted, have never been devoted to public use, and with respect to those parcels no complaint is made by appellants which will require separate consideration.

The court refused to reserve in its judgment any electric railroad power pole line or subway rights to these defendants or to limit the plaintiff's taking to an estate subject to the existing pole line and subway rights. The lands are by the judgment condemned in fee, and in effect it requires the elimination of the power pole line and subway from the parkway district. The court also denied the defendant any award for the taking of pole line parcel 46½. The court, while it made allowances to defendants for certain taxes and assessments which accrued since the commencement of this action, refused to provide for payment to defendants of other taxes and assessments which may be levied upon the condemned lands before the entry of final judgment and payment of awards.

Among the principal points which appellants urge upon this appeal are the following:

1. That the court erred in refusing to preserve to defendants their existing electric railroad power pole line and subway rights in parcels 43, 46, 46½, 87, 93, and 94.

2. That the court erred in refusing to make allowance for accruing taxes and assessments as requested by defendants.

3. That an award should have been made for the taking of pole line parcel 46½.

Also, that the court failed to find upon important issues of fact, and that certain material findings fail of support in the evidence.

An issue as to consistency between the proposed park use and the existing uses claimed by appellants, and of the right to a reservation of the right of common user, was raised by the answer, which besides denying the necessity of taking the whole or any part of the land for park purposes, also set forth the existing public uses to which the lands of defendants had been devoted by them, and alleged damages which will accrue to portions not sought to be condemned, unless such reservation of the right of common user be allowed. This issue is not met by the findings, except by finding that "it is necessary that the plaintiff take and condemn for public use" the described land. It is also found, in effect, that the subway parcels are not devoted to public use. There is no specific finding that the taking of an unqualified fee is necessary for the purpose for which the plaintiff is condemning, but the court, as a conclusion of law, holds "that the

plaintiff is entitled to an interlocutory judgment adjudging that . . . said property be condemned in fee to the use of the plaintiff for public park purposes.'' In the absence of qualification, this must mean an absolute, unconditional fee, ever free from all rights on the part of the defendants to use the premises for either electric railroad, power pole line, or subway purposes.

Appellants contend, and it is not denied, that the court treated this question as a question of law and not as one of fact. The court deemed itself bound by the decision of the city council to take the fee of the lands described in the ordinance of intention, because the legislature, in the court's opinion, had delegated to the city council the determination of the question of what lands should be taken and what estate therein should be taken for park or playground purposes, and assumed that that determination was, under the park act, final, and deprived the court of any power whatever to pass upon these questions which appellants say are delegated to the court under sections 1240 and 1247a of the Code of Civil Procedure. The court treated it as a question of necessity, and determined the case upon a solution of the question of whether the council's decision is conclusive as to the necessity of taking any particular land for a given improvement, and the necessity of taking the entire estate in the land.

The ''Park and Playground Act of 1909,'' in section 7 thereof, referring to condemnation of land for park purposes, reads as follows: ''The complaint shall set forth, or state the effect of, the ordinance of intention, and the ordinance ordering the improvement, but need not set up any other proceedings had before the bringing of the action. Said ordinances shall be conclusive evidence, in such action, of the public necessity of the proposed improvement.'' As stated in the complaint and found by the court, the city council by its ordinance, adopted by a vote of more than two-thirds of its members, declared that the public interest and convenience required that the described lands be acquired for park purposes, and that for that purpose it is necessary that the plaintiff take and condemn for public use the said lands; and the court, relying upon that ordinance, and without other evidence showing the necessity for the taking, made its findings as we have stated.

Section 5 of the Park and Playground Act provides for a condemnation action to be brought, pursuant to direction therefor by the city council; and section 6 declares that "said action shall in all respects be subject to and governed by such provisions of the Code of Civil Procedure now existing, or that may be hereafter adopted as may be applicable thereto, except in the particulars otherwise provided for in this act." The procedure in condemnation is outlined in the title on Eminent Domain, section 1237 et seq. of the Code of Civil Procedure. Section 1241, as in force in January, 1913, when this action was commenced, provides that "Before property can be taken, it must appear: . . . 2. That the taking is necessary to such use." By an amendment in force on August 10, 1913 (before this action came on for trial), the following addition was made to subdivision 2 of that section: "*Provided,* when the legislative body of a county, city and county, or an incorporated city or town, shall, by resolution or ordinance, adopted by vote of two-thirds of all its members, have found and determined that the public interest and necessity require the acquisition, construction or completion, by such county, city and county, or incorporated city or town, of any proposed public utility, or any public improvement, and that the property described in such resolution or ordinance is necessary therefor, such resolution or ordinance shall be conclusive evidence; (a) of the public necessity of such proposed public utility or public improvement; (b) that such property is necessary therefor, and (c) that such proposed public utility or public improvement is planned or located in the manner which will be most compatible with the greatest public good, and the least private injury; *provided,* that said resolution or ordinance shall not be such conclusive evidence in the case of the taking by any county, city and county, or incorporated city or town, of property located outside of the territorial limits thereof."

Section 1240 of the Code of Civil Procedure, as in force in January, 1913 [Stats. 1911, p. 620], provides that "The private property which may be taken under this title includes: . . . 4. Property appropriated to public use; but such property shall not be taken unless for a more necessary public use than that to which it has already been appropriated; *provided,* that where any such property has been so appropriated by any individual, firm or private corporation, the

use thereof for a public street or highway of a municipal corporation, or the use thereof by a municipal corporation for the same public purpose to which it has been so appropriated, shall be deemed more necessary uses than the public use to which such property has been already appropriated; *and provided, further, that where property already appropriated to a public use* or purpose, by any person, firm or private corporation, *is sought to be taken by a municipal corporation, for another public use or purpose, which is consistent with the continuance of the use of such property or some portion thereof for such existing purpose,* to the same extent as such property is then used, or to a less or modified extent, *then the right to use such property for such proposed public purpose, in common with such other use or purpose,* either as then existing, or to a less or modified extent, *may be taken by such municipal corporation, and the court may fix the terms and conditions upon which such property may be so taken, and the manner and extent of the use thereof for each of such public purposes, and may order the removal or relocation of any structures or improvements therein or thereon, so far as may be required by such such common use.''* By amendment in force August 10, 1913, said subdivision 4 was amended to read as follows: ''Property appropriated to public use; but such property shall not be taken unless for a more necessary public use than that to which it has already been appropriated; *provided,* that where any such property has been so appropriated by any individual, firm or private corporation, the use thereof for a public street or highway of a county, city and county, or incorporated city or town or the use thereof by a county, city and county, or any incorporated city or town or municipal water district, for the same public purpose to which it has been so appropriated, or for any other public purpose, shall be deemed more necessary uses than the public use to which such property has already been appropriated; *and provided, further,* that where property already appropriated to a public use or purpose by any person, firm or private corporation, is sought to be taken by a county, city and county, incorporated city or town, or municipal water district, for another public use or purpose, which is consistent with the continuance of the use of such property or some portion thereof for such existing purpose, to the same extent as such property is then used, or to a less or modified

extent, then the right to use such property for such proposed public purpose, in common with such other use or purpose, either as then existing, or to a less or modified extent, may be taken by such county, city and county, incorporated city or town, or municipal water district, and the court may fix the terms and conditions upon which such property may be so taken, and the manner and extent of the use thereof for each of such public purposes, and may order the removal or relocation of any structures or improvements therein or thereon, so far as may be required by such common use. But property appropriated to the use of any county, city and county, incorporated city or town or municipal water district, may not be taken by any other county, city and county, incorporated city or town, or municipal water district while such property is so appropriated and used for the public purposes for which it has been so appropriated.'' Section 1247a of the Code of Civil Procedure reads as follows: ''The court shall also have power to regulate and determine the place and manner of removing or relocating structures or improvements, or of enjoying the common use mentioned in the fourth subdivision of section 1240.''

No one here denies that the power to finally determine the necessity of taking specified property for a public use may be delegated to a city council. The questions now at issue are to be settled by reading the Park and Playground Act together with the code provisions applicable to the case, and thereby ascertaining the legislative will. The statutes contemplate the taking of private property for public use. They also contemplate that property already devoted to a public use may be taken for a more necessary public use. They further contemplate that where it is proposed to take for public use property already devoted to a public use, and where the proposed new use is also consistent with the existing public use, the two rights shall be exercised in common, under the terms and conditions appropriate to the case. To meet this particular situation, section 1240 of the Code of Civil Procedure, in subdivision 4 thereof, authorizes the court in its decree of condemnation, to ''fix the terms and conditions upon which such property may be so taken, and the manner and extent of the use thereof for each of such public purposes.'' In the comparative construction of statutes, they are to be harmonized as fully as may be, so as to give them complete

and reasonable effect. An apt means to this end is obtained by permitting a statute, applicable to a particular class of facts, to operate as a modification of statutes of broad and general scope. So here we may assume that the general rule as found in section 1241 of the Code of Civil Procedure and in the Park and Playground Act authorizes the city council, in an ordinance like that here in question, to finally determine that the public necessity and convenience require that certain described land be condemned for park purposes. But this general rule is modified by subdivision 4 of section 1240, enacted to meet the specifically designated case where it is proposed to condemn land already subject to an existing public use. In this particular situation, while the court, under the above assumption, will recognize as final the determination of the council that the taking of the land is necessary for the proposed use, it is required also to recognize the existing public use, and to provide for the terms and conditions upon which the existing use may continue, if in fact the two uses are capable of coexisting on the same premises. It is not uncommon to have railroads in parks, and their presence has been so regulated that they aided in making the parks accessible, without interfering with safe administration of both of those public uses. (*People* v. *Park and Ocean R. R. Co.,* 76 Cal. 156, [18 Pac. 141].) Respondent's counsel argue that these principles can have no application in this case, because the use for which the city seeks to take the property is not, and under the law cannot be, consistent with the existing use of the property. They say that the use of the property either for the purpose of maintaining a pole line thereover or a subway thereunder is not, and as a matter of law cannot be, consistent with its use for park purposes, since the organic law governing the city of Los Angeles prohibits the use of park lands for any other purpose whatsoever. The property sought to be condemned in this action is sought to be taken for the purpose of a public park and for no other purpose, and the charter of the city of Los Angeles provides: "All lands and real property located in the city of Los Angeles which have been heretofore, or which may be hereafter, set apart or dedicated for the use of the public as a public park or parks, shall forever remain to the use of the public as such park or parks, inviolate, and no part of said lands or real property shall ever be used or occupied for any other pur-

pose.'' (Charter of the City of Los Angeles, sec. 119b, Stats. 1911, p. 2113.)

Under this provision, it is contended that the city has no power to permit the use of any part of a public park for the maintenance of a power line or of a railroad, either above, on, or below the surface of the ground; that the use of park lands for such purposes would be unlawful, and the city would not have the power to condemn land for park purposes subject to a use prohibited by the charter; therefore, they say, it follows that the use which the city intends to make of the land sought to be taken is not, and under the law cannot be, consistent with the continuance in use of such land for pole line purposes, or for the projected subway, and neither the court, the city council, nor any other tribunal would have the power to find or declare that the use of the land for park purposes was consistent with its use for any other purpose, and for these reasons that the court was not only not required to pass upon the question of consistency, but was without any power whatsoever to do so.

In response to the above contention we may observe, by the way, that the ordinance upon which respondent relies does except from condemnation certain railroad rights of way located within the limits of the proposed park, and those exceptions are carried into the judgment of condemnation. It is also worthy of note that the pole line and the right of way for a subway pertain to a railroad which extends beyond the city limits and is under state control. If respondent's theory of the case is to be accepted, it will follow that a state or interstate railway, having established rights of way, tracks, and depots within the city, may be excluded from the city by virtue of a city ordinance ordering that the lands thus occupied shall be taken and included within a city park, and the courts must obey such legislative mandate by condemning the property, without the right to make any inquiry as to the consistency of the public uses, or to prescribe conditions under which the several uses may coexist. Under the statutes to which we have referred, we do not perceive that any such extraordinary limitations have been drawn around the judicial power as vested in the courts. And giving to the above-quoted section of the city charter its full effect in any case to which, within the limits of the state constitution, it may be applied, it means no more than that when land has been

acquired by the city for park uses, such land shall not thereafter be appropriated to other uses.

Respondent's counsel insist that the use of the land occupied by appellants for pole line purposes is not a public use, because the power is furnished only to the railway company and not to the general public. They rely upon authorities which they claim in support of the proposition that a power pole line furnishing electric power to operate the cars of a railway company is not a part of the railroad or a necessary adjunct thereto, in aid of which such company would be entitled to exercise the power of eminent domain. Conspicuous among the decisions to which they refer is *Re Condemnation of Land by Rhode Island Suburban Ry. Co.,* 22 R. I. 455, [52 L. R. A. 879, 48 Atl. 590]. The action was one wherein the railway company sought to condemn a lot for a power-house, to generate electricity for its lines of road, for coal pockets for the storage of coal, and for a conduit to carry water from the river to the engine. The supreme court of Rhode Island set aside the judgment in favor of petitioner and ordered a new trial. The court conceded that it is not always necessary that the public use be direct and obvious. "There is a class of cases where the public does not use the land itself, and yet the public necessity is so direct and obvious as to imply a public use. Such, for example, are cases of taking land for engine-houses, car-houses, and repair-shops on steam railroads. These buildings must necessarily be contiguous to the railroad, and, while the public may not use the buildings as such, yet they are of such a character that, without them, the public could not adequately use the railroad itself. They are in fact a part of the railroad. In some cases land for the storage of wood and coal for steam railroads has been held to be taken for a public use. In all of these cases, however, a particular location is made necessary, because of the requirements of the steam railroads." The court was of the opinion that these considerations do not apply to an electric railroad, since in the latter case there is a wide area of location and consequent freedom of choice, as contrasted with the imperative necessity which is usually found on steam railroads for a particular location. "Neither is it of interest to the public whether the cars are run by trolley or by storage batteries. The company is not limited to a particular location for a power-house, for coal pockets, or for a water sup-

ply." The foregoing decision was discussed in *Rockingham County Light & Power Co.* v. *Hobbs,* 72 N. H. 531, [66 L. R. A. 581, 58 Atl. 46], where that court expressed a different view of the matter, and pointed out the reason why greater freedom of choice of location in the case of an electric road does not interfere with the element of necessity in determining the right of condemnation. "It is probable that in many cases the establishment and operation of electric railways for the accommodation of the public will depend upon the possibility of generating or collecting electricity at a low cost. A water-power, or a port at which coal may be landed from sea-going vessels directly into the coal pockets of a power-house, will render it possible to furnish electric railway facilities for public use at points situated many miles distant from the water-power or port, that could not otherwise be furnished at all, or, at least, without much greater cost to the public. In such cases the imperativeness of the necessity attaches to the freedom of choice as to location, rather than to the proximity of a particular location to the railroad line. If land adjoining an electric railway may be taken for a power-house—as to which there can be no doubt—no good reason is apparent why land at a distance may not be taken if the public good so requires. Of course, if land located at a distance may be taken for a power-house, *it must follow that necessary land, or rights in land, may be taken for constructing and maintaining a line of wires between the power-house and the railway.*" Without entering into a discussion of the lines of decision illustrated above—there being apparently no California decision directly meeting the specific case—we are of the opinion that the power pole lines in question here are devoted to a public use as part of the railway system operated by the Pacific Electric Railway Company. In their principal essentials, electric railroads now have the same legal *status* as steam railroads.   (Civ. Code, sec. 465a.)

Section 465 of the Civil Code says: "Every railroad corporation has power: . . . 3. To purchase, . . . hold and use all such real estate and other property as may be absolutely necessary for the construction and maintenance of such railroads, and for all stations, depots and other purposes necessary to successfully work and conduct the business of the road;

"4. To lay out its road . . . and to construct and maintain the same, . . . with such appendages and adjuncts as may be necessary for the convenient use of the same;

"7. To purchase lands . . . to be used in the construction and maintenance of its road, and all necessary appendages and adjuncts, or acquire them in the manner provided in title seven, part three, Code of Civil Procedure, for the condemnation of lands."

Since, as we have concluded, parcels 43, 46, and 46½ have been dedicated to public use, it becomes the duty of the court to determine, as a matter of fact, the issue raised as to the consistency or inconsistency of that use with the proposed park use. If the respective uses are not in fact wholly inconsistent, then it was the further duty of the court to fix the terms and conditions of condemnation by the city, and the manner and extent of use of the property "for each of such purposes."

The same result would follow as to the so-called subway parcels, if in fact they were devoted to public use as subways of the railroad prior to the commencement of proceedings by the city for the creation of the proposed park. As to each of these parcels, the finding of fact, based upon undisputed evidence, is that the land was purchased and is held by the defendant Los Angeles Pacific Land Company "for a special and peculiar purpose and use, to wit, for the purpose of constructing therein, thereunder and over, and in and along its lands extending from a point in the vicinity of Fourth and Hill Streets in the city of Los Angeles, in a general westerly and southerly direction through said parcel to the westerly city limits of the city of Los Angeles and beyond to a point of connection in the railroad of the Pacific Electric Railway Company at or near Vineyard station, a railroad to be operated through a subway; but in this connection the court finds the fact to be that said land was not at the commencement of this action and is not now, and never has been, used for such purposes; and further, that said defendant has not acquired either the fee to or easements or rights of way under or over, or any other interests in, such entire strip of land between said terminal points as would be necessary in order to enable it to construct and operate such railroad, nor has it acquired any franchise so to do." Although the title to the parcels in question is held in the name of the land com-

pany, the consideration therefor was paid by the railway company, and the land is held for its use for the purpose stated in the findings. The entire expenditures made by the defendant in purchasing the property required by it for the proposed subway exceeded two millions of dollars, and there is a great public need for a subway, to relieve the congestion of traffic on the street surfaces of the city. The enterprise, although delayed, has not been, in any sense of the word, abandoned by the railway company. About ninety per cent of the right of way therefor has been acquired. All of this is shown by uncontradicted evidence. The judgment of the court below, in its relation to the matter of the subway, proceeds upon the theory that, under the facts found, these parcels were not already devoted to public use, but should be treated as private property.

"It is property appropriated to public use, which is . . . protected from condemnation except 'for a more necessary public use'; and as to lands owned by defendant, but which have not been thus appropriated, *and are not likely in the future to be needed* for the existing public use, the inhibition does not apply." (*Southern Pac. R. R. Co.* v. *Southern Cal. Ry. Co.,* 111 Cal. 221, [43 Pac. 602].) In that case it was clear that the strip of land sought to be condemned—although located within the limits of a tract acquired by defendant as part of its right of way—was not in use by the defendant and would not probably be needed for railroad purposes. The defendant had completed its road upon adjacent land, and had ample room thereon for its business. We are plainly left to infer that if the execution of its plans had been merely unfinished, and if the orderly completion of the work under those plans had required that defendant use for railroad purposes the land sought to be condemned for the use of the plaintiff, the claimed prior devotion thereof to public use by the defendant would have been sustained. From the findings quoted above, it seems that the court, in determining that the parcels in question have not been appropriated to a public use, placed its principal stress upon the facts that appellants have not yet acquired title to all of the property necessary to complete the strip over which they expect to construct the proposed lines, and have not obtained any franchise allowing the road to be constructed across the streets which intersect the strip. We cannot subscribe to the doctrine that no part

of a right of way may be considered as having been devoted to the public use for which it has been acquired, until all of the right of way has been acquired. That rule would place unreasonable and unnecessary obstacles in the way of such enterprises. It is sufficient that a corporation in charge of a public use, in the due prosecution of its enterprise, has lawfully obtained for that use property necessary therefor, with a reasonable prospect that the work will be carried to completion. And the prior ownership of a franchise relating to street crossings is not essential to the right to condemn, or to hold for the proposed use, other portions of the right of way. (*Tuolumne Water etc. Co.* v. *Frederick,* 13 Cal. App. 498, [110 Pac. 134].)

It is our opinion that the court in its findings should have determined as a matter of fact, both as to the pole line and the subway parcels, whether they had been devoted to a public use, and that upon this issue the burden of proof was upon the defendants. If either of them was devoted to a public use, then the court should have determined as a matter of fact whether that and the proposed use were consistent, and on this issue the burden of proof was upon the plaintiff to show that the uses were not consistent and that they were not on any reasonably possible terms capable of continuing together on the parcels sought to be condemned. The general principle that the state will not exercise the power of eminent domain any further than the necessity of the public requires is recognized by the provisions of the code to which we have referred. Therefore, after the defendants in a case like this have shown that their land is devoted to a public use for which the right of condemnation might be exercised in their behalf, they are protected from destructive interference unless the city can establish by sufficient evidence that in fact the use for park purposes cannot coexist with continued use of the property by the defendants.

Appellants claim that the court in making its interlocutory judgment erred in refusing to reserve this action for further orders covering the matter of taxes and assessments accrued subsequent to the commencement of the action and levied by the city of Los Angeles. In accordance with the findings of fact, the court allowed to the defendants certain sums covering the values of the parcels of land to be condemned, of which it was specified that certain portions of the aggregate sums

represented taxes and assessments which became liens upon said parcels subsequent to the filing of this action and which the defendants have paid or owe. The defendants requested that the interlocutory judgment contain a provision reserving the case for further consideration in order that the respective defendants may receive, in addition to the awards therein provided for, the amount of any and all taxes and assessments upon parcels of land owned by them respectively which shall have been levied or accrued or become a lien upon said premises at the time of payment of the awards herein. With this request the court did not comply, and we think that the refusal was justified. In section 1249 of the Code of Civil Procedure it is provided that for the purpose of assessing compensation and damages (when, as in this case, the issue is tried within one year after the date of commencement of the action), "the right thereof shall be deemed to have accrued at the date of the issuance of summons and its actual value at that date shall be the measure of compensation for all property to be actually taken. . . . If an order be made letting the plaintiff into possession, as provided in section 1254, the compensation and damages awarded shall draw lawful interest from the date of such order. . . . " Section 1254 states the conditions under which, pending an appeal from the judgment, a plaintiff who has paid into court, for the defendant, the required sums, may take possession of and use the property until the final conclusion of the litigation. The property is not taken, so as to interfere with the defendants' ownership of their property, until the compensation is made to, or paid into court for, the owner. These facts draw a line of distinction between the case in hand and the New York decisions relied upon by appellants. (*In re Mayor etc. of the City of New York,* 40 App. Div. 281, [58 N. Y. Supp. 58]; *In re Morris Avenue in the City of New York,* 118 App. Div. 117, [103 N. Y. Supp. 180].) Those cases arose under statutes whereby the actual appropriation of property occurred at a time prior to the ascertainment of the amount of damages to be paid. Manifestly, the defendants could not be charged with subsequent taxes against property which they had ceased to own. Therefore, the city was not permitted to retain, out of the award made in the condemnation proceedings, the amount of such tax assessments. Section 1249 of the Code of Civil Procedure, "excludes all consideration of

other than the value of the property at the date of the issuance of the summons in the action.'' (*City of Los Angeles* v. *Gager*, 10 Cal. App. 378, [102 Pac. 17].)

It is next claimed that the court erred in refusing to make an award to defendant Pacific Electric Railway Company for the taking of power pole line parcel 46½. Respondent replies that in fact the term ''Parcel 46½'' was not used to designate any parcel of land sought to be taken, but was a term adopted merely for convenience, to indicate that portion of the pole line which had been built across certain parcels designated by appropriate numbers and which were all owned by defendants other than these appellants, and awards were made to the owners for the taking thereof. To this appellants reply that the bill of exceptions is stipulated to contain all of the evidence in the case and a full and true copy ''of all of the judgment-roll, except the pleadings of defendants other than the above-named defendants, which said pleadings of said other defendants do not relate to or in any manner affect the rights of the above-named defendants-appellants herein and have no bearing upon the issues raised by the said defendants-appellants in the superior court''; and appellants say that there is no evidence to the effect that there is or was any other owner of parcel 46½ or any interest therein, except the Pacific Electric Railway Company, who was in occupation of the same under claim of dedication and who was devoting the same to public use; that the evidence is absolutely all one way on this point, and that therefore the court erred in failing to award to appellants the value of the right of way. While it does appear in the findings and judgment that the court found that this land belonged to other defendants and did award to other defendants sums for the taking thereof, appellants claim that under this bill of exceptions, which contains all of the evidence in the cause, that those findings and those awards were entirely without the support of any evidence. In the answer of defendants they describe the so-called power pole line parcel 46½, allege their ownership thereof and devotion thereof to public use, and further say ''that said parcels of land constitute a part of a right of way for said transmission power line, as an adjunct to the railroad of the defendant, and if said parcels of land are taken without reserving to these defendants the right to hereafter maintain and operate said high power transmission line, this

defendant and said remaining portion of said lands will be damaged in the sum of one million dollars; that the defendant Pacific Electric Railway Company now owns, and has for many years heretofore owned and been in possession of, a right of way through'' certain lands, describing the same in detail.   Testimony was introduced by the defendants showing the facts with reference to the dedication of the land to public use and the acquirement of title to a perpetual pole line easement by the Pacific Electric Railway Company.   Basing their argument upon the facts thus shown, appellants contend that the owner of the land, by permitting the railway company to enter thereon and establish its public use, thereby dedicated the land to public use so that the title to the land, so far as necessary to that public use, passed to the company; that is, a perpetual easement; that the defendant has therefore a title to this power pole line easement by dedication, and not by adverse possession.   It has been held in the case of public service corporations that when it appears that, although the entry was originally without right, the owner permitted the corporation to make an entry on his land and complete and construct works for which his land was appropriated, and failed to bring an action until after public interests, by reason of the construction, have intervened, the right of the owner to maintain ejectment is denied and he is remitted to an action for damages alone.   (*Gurnsey* v. *Northern California Power Co.,* 160 Cal. 699, 709, [36 L. R. A. (N. S.) 185, 117 Pac. 906].)   It follows, say appellants, that they are entitled to compensation for the taking of this land, although their title was an easement only.

To the foregoing the respondent replies that the answer contains only an allegation of ownership by the defendants of a right of way over the land (Tr., fols. 477–493).   Respondent denies that the testimony shows a dedication thereof to public use and the acquiring of title to a perpetual or any pole line easement.   This argument seems to be based upon the previous argument that the use of a pole line for the purposes described is not a public use.   It is admitted by respondent that the testimony shows the construction of the pole line and its use for transmission of power to the railway company, but respondent says this does not prove that any title to an easement has been acquired.   (Respondent's Brief, p. 163 et seq.) "Not only did they fail to introduce any testimony to that

end, but even had they done so, the finding of the court that the title to the land embraced in the parcels traversed by this portion of the pole line was in other parties, was equivalent to a finding against the contention of these appellants.''

We are inclined to the view that *Gurnsey* v. *Northern California Power Co.*, 160 Cal. 699, [36 L. R. A. (N. S.) 185, 117 Pac. 906], recognizes that under the circumstances there stated the easement acquired by the corporation became a substantial property right, the value of which would have to be accounted for by any other party seeking to enforce a superior right of eminent domain upon the same premises. The owners of the fee, therefore, are not entitled to all of the compensation to be allowed for the taking of the land, if the right of way is to be included in the condemnation without any reservation of further right of use thereof by the defendants.

It is deemed unnecessary to review in detail the several other claims by appellants that the findings do not cover all of the issues raised by the answer, and that the evidence is insufficient to support certain findings. Assuming that upon another trial the court will apply to the case the principles which we have endeavored to make clear in this decision, it is not to be expected that the findings then made will omit any necessary fact or leave room for doubt as to their meaning.

The judgment and order are reversed.

James, J., and Shaw, J., concurred.